JOE MELANSON,                          §
                                       §
              Plaintiff,               §
                                       §
*versus*                               §     CIVIL ACTION NO. 1:07-CV-564
                                       §
COVENANT HOMELAND SECURITY             §
SOLUTIONS, LTD.,                       §
                                       §
              Defendant.               §

## MEMORANDUM AND ORDER

Pending before the court is Defendant Covenant Homeland Security Solutions, Ltd.'s ("Covenant") Motion for Summary Judgment (#32). Covenant seeks summary judgment on Plaintiff Joe Melanson's ("Melanson") action alleging discriminatory discharge based on his age in violation of the Texas Commission on Human Rights Act, TEX. LAB. CODE ANN. §§ 21.001-21.128 ("TCHRA"). Having reviewed the pending motion, the submissions of the parties, the pleadings, and the applicable law, the court is of the opinion that summary judgment is warranted.

I.     Background

Melanson, born in 1959, is a resident of Jefferson County, Texas, and began employment as a security officer at the Big Hill Strategic Petroleum Reserve ("SPR"), located near Beaumont, Texas, in 1991. The reserve is owned and controlled by the Department of Energy ("DOE") and has been operated by DynMcDermott Petroleum Operations Company ("DynMcDermott") since 2002. Pinkerton Security Services ("Pinkerton" or "PGS") provided security at the site from 2002 until 2005. In October 2005, Covenant (then known as Worldwide Security Services, Ltd.)

replaced Pinkerton as the subcontractor responsible for site security. Covenant is an Illinois corporation authorized to conduct business in Texas.

On December 21, 2006, after approximately fifteen years of service, Melanson was terminated for purportedly violating company procedure. At the time of his termination, Melanson was designated a K-9 Specialist and was responsible for training and handling explosive detection dogs at the Big Hill SPR. As part of his job duties, Melanson periodically retrieved explosive training aids from various numbered canisters in the site's armory and concealed them in designated search areas. Melanson then brought an explosive detection dog to the particular area and commanded it to locate the hidden items. After the training exercise was completed, Melanson was required to retrieve all the training aids and return them to the armory. Each month, Melanson, or another K-9 Specialist, was also expected to conduct an inventory with either the Site Security Captain or his designee to ensure that all training aids had been returned to the explosives storage magazine.

According to Melanson, throughout most of his tenure at the Big Hill site, he had a "spotless employee file." Sergeant Allison Humphrey ("Humphrey"), a Security Police Officer ("SPO") at Covenant and one of Melanson's former co-workers, confirmed at deposition that Melanson was generally an honest man and a hard worker. In the three months prior to his termination, however, Melanson was the subject of formal disciplinary action on three separate occasions. The first of these instances occurred on August 31, 2006, when Melanson was cited for violating Covenant's written policies regarding security lock and key control. At approximately 9:30 a.m. the previous morning, Melanson obtained two keys from Humphrey in order to retrieve multiple training aids from the armory. Neither Humphrey nor Melanson signed

the keys out using the proper sensitive items accountability form. Melanson claims to have returned all equipment, including the magazine keys, when he returned to the armory at approximately 1:15 p.m. An inventory conducted by Lieutenant Michael Lezak ("Lezak") at 6:10 p.m. indicated that the keys were present. When Melanson attempted to obtain the keys again the next day, however, they were missing. An internal investigation was conducted by Big Hill Site Security Captain Barton Smith ("Smith"), but the keys were never located. Melanson received a written warning, stating that he "violated proper security key control and accountability, which resulted in the loss of the security keys to the padlocks located on the site's K9 explosives storage magazine." Further, the warning advised Melanson that "a re-occurrence of this type will result in a more stringent form of corrective action, up to and including termination of his employment from Covenant Homeland Security Solutions, Ltd."

On October 19, 2006, Melanson received a second written warning for violating company protocol. A few months after he was promoted from SPO to K-9 Specialist in April 2004, Melanson requested permission to step down from his new position. Following Covenant's assumption of security services at the Big Hill site, Melanson continued to seek voluntary demotion. Smith advised him that any such request would have to be submitted in writing. Rather than sending a written request to his immediate supervisors, Smith and K-9 Manager Adolpho Garcia, as required by company protocol, however, Melanson sent his request via e-mail to all Covenant employees on October 9, 2006. Melanson was subsequently issued a written warning, stating that he had "violated proper use of the chain of command." Melanson was advised that "[h]e should have followed proper protocol" and again counseled that further re-occurrences could result in his termination.

In December 2006, Melanson was found to have violated company procedure for a third time. This final disciplinary action arose from a monthly inventory conducted by Melanson and Lieutenant Allen Nelson ("Nelson") on November 30, 2006. During the course of the inventory, a ten-foot section of safety fuse was determined to be missing from training aid canister nine. According to the inventory log, the fuse was present on October 26, 2006, when a monthly inventory was conducted.[1] Subsequently, on November 15, 2006, Melanson signed training aid nine out in order to conduct training exercises in the "Field by 114." When Melanson returned training aid nine to the armory later that afternoon, Sergeant Tom Parrish ("Parrish") initialed the log, and Melanson made the following notation: "Inventory Conducted All Accounted for." The evidence indicates that no other employee accessed training aid nine after October 26, 2006. Indeed, following the resignation of the only other K-9 Specialist at the Big Hill site on August 26, 2006, the log shows that Melanson was the sole person who signed out explosive training aids. After Melanson and Nelson reported their findings to Smith and two additional inventories were conducted, a ten-foot segment of fuse was confirmed to be missing from training aid nine. On December 2, 2006, the missing fuse, which appeared to have been exposed to the elements for some time, was discovered in the West Laydown Yard.

On December 21, 2006, upon the conclusion of Covenant's internal investigation, Melanson was notified in writing that his employment was being terminated. The completed disciplinary form that he received states the basis for the discharge:

---

[1] The October inventory is signed by Smith and Melanson. At deposition, however, Melanson denied participating in this inventory and testified that Smith asked him to sign the log after Covenant initiated its internal investigation of the missing training aid incident.

> K9 Specialist Melanson violated proper inventory procedures when he failed to ensure accountability of all training aids upon completion of each canine training session. Written procedure requires a 100% inventory of all explosive aids every time training aids are removed from the magazine. Failing to properly inventory all training aids resulted in a[n] explosive being unaccounted for over an extended period. Due to the severity of this offense and previous written warnings issued to K9 Specialist Melanson, his employment with Covenant Homeland Security Solutions, Ltd., is being terminated.

Melanson, however, insists that this explanation is unworthy of credence. He maintains that Covenant had no written procedures regarding proper training aid inventory at the time he was terminated, a fact which he alleges Covenant has repeatedly attempted to conceal.

On June 11, 2007, Melanson filed suit against Covenant in the 172nd Judicial District Court of Jefferson County, Texas, asserting claims of age discrimination pursuant to the TCHRA. On August 10, 2007, Covenant removed the case to this court on the basis of diversity jurisdiction. Covenant filed the instant motion for summary judgment on December 3, 2008, contending that Melanson has failed to adduce sufficient relevant evidence to establish a genuine issue of material fact as to whether his discharge was the result of age discrimination. Covenant argues that the record clearly establishes that Melanson was terminated for his violation of proper inventory procedures, compounded by the seriousness of losing an explosive training aid and the issuance of two previous warnings. In response, Melanson maintains that he has proffered sufficient evidence to create a genuine issue of material fact as to the validity of Covenant's articulated reason for his discharge.

II.   Analysis

A.   Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on

file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Warfield v. Byron*, 436 F.3d 551, 557 (5th Cir. 2006); *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Martinez v. Schlumberger, Ltd.*, 338 F.3d 407, 411 (5th Cir. 2003); *Terrebonne Parish Sch. Bd. v. Mobil Oil Corp.*, 310 F.3d 870, 877 (5th Cir. 2002).

"A fact is '*material*' if it '*might affect* the outcome of the suit under governing law.'" *Bazan ex rel. Bazan v. Hidalgo County*, 246 F.3d 481, 489 (5th Cir. 2001) (emphasis in original) (quoting *Anderson*, 477 U.S. at 248); *accord Cooper Tire & Rubber Co. v. Farese*, 423 F.3d 446, 454 (5th Cir. 2005); *Harken Exploration Co. v. Sphere Drake Ins. PLC*, 261 F.3d 466, 471 (5th Cir. 2001). "Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. "An issue is '*genuine*' if it is real and substantial, as opposed to merely formal, pretended, or a sham." *Bazan*, 246 F.3d at 489 (emphasis in original). Thus, a genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord EMCASCO Ins. Co. v. American Int'l Specialty Lines Ins. Co.*, 438 F.3d 519, 523 (5th Cir. 2006); *Cooper Tire & Rubber Co.*, 423 F.3d at 454; *Harken Exploration Co.*, 261 F.3d at 471. The moving party, however, need not negate the elements of the nonmovant's case. *See Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540

(5th Cir. 2005); *Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996) (citing *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)).

Once a proper motion has been made, the nonmoving party may not rest upon mere allegations or denials in the pleadings but must present affirmative evidence, setting forth specific facts, to show the existence of a genuine issue for trial. *Celotex Corp.*, 477 U.S. at 322 n.3 (quoting FED. R. CIV. P. 56(e)); *Anderson*, 477 U.S. at 256; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.11 (1986); *EMCASCO Ins. Co.*, 438 F.3d at 523; *Smith ex rel. Estate of Smith v. United States*, 391 F.3d 621, 625 (5th Cir. 2004); *Malacara v. Garber*, 353 F.3d 393, 404 (5th Cir. 2003). "[T]he court must review the record 'taken as a whole.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (quoting *Matsushita Elec. Indus. Co.*, 475 U.S. at 587); *see Riverwood Int'l Corp. v. Employers Ins. of Wausau*, 420 F.3d 378, 382 (5th Cir. 2005). All the evidence must be construed "in the light most favorable to the non-moving party without weighing the evidence, assessing its probative value, or resolving any factual disputes." *Williams v. Time Warner Operation, Inc.*, 98 F.3d 179, 181 (5th Cir. 1996); *see Reeves*, 530 U.S. at 150; *Lincoln Gen. Ins. Co.*, 401 F.3d at 350; *Smith*, 391 F.3d at 624; *Malacara*, 353 F.3d at 398; *Brown v. City of Houston*, 337 F.3d 539, 541 (5th Cir. 2003); *Harken Exploration Co.*, 261 F.3d at 471. The evidence of the nonmovant is to be believed, with all justifiable inferences drawn and all reasonable doubts resolved in his favor. *Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49 n.5 (1990) (citing *Anderson*, 477 U.S. at 255); *Shields v. Twiss*, 389 F.3d 142, 150 (5th Cir. 2004); *Martin v. Alamo Cmty. Coll. Dist.*, 353 F.3d 409, 412 (5th Cir. 2003); *Martinez*, 338 F.3d at 411; *Gowesky v. Singing River Hosp. Sys.*, 321 F.3d 503, 507 (5th Cir.), *cert. denied*, 540 U.S. 815 (2003).

Nevertheless, "'only *reasonable* inferences can be drawn from the evidence in favor of the nonmoving party.'" *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 469 n.14 (1992) (emphasis in original) (quoting *H.L. Hayden Co. of N.Y., Inc. v. Siemens Med. Sys., Inc.*, 879 F.2d 1005, 1012 (2d Cir. 1989)). "If the [nonmoving party's] theory is . . . senseless, no reasonable jury could find in its favor, and summary judgment should be granted." *Id.* at 468-69. The nonmovant's burden is not satisfied by "'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,'" by speculation, by the mere existence of some alleged factual dispute, or "by only a 'scintilla' of evidence." *Little*, 37 F.3d at 1075 (quoting *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 888 (1990); *Matsushita Elec. Indus. Co.*, 475 U.S. at 586; *Hopper v. Frank*, 16 F.3d 92, 97 (5th Cir. 1994); *Davis v. Chevron U.S.A., Inc.*, 14 F.3d 1082, 1086 (5th Cir. 1994)); *accord Warfield*, 436 F.3d at 557; *Boudreaux*, 402 F.3d at 540. "Unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." *Brown*, 337 F.3d at 541; *accord Hugh Symons Group, plc v. Motorola, Inc.*, 292 F.3d 466, 468 (5th Cir.), *cert. denied*, 537 U.S. 950 (2002); *see Hockman v. Westward Commc'ns, LLC*, 407 F.3d 317, 332 (5th Cir. 2004); *Bridgmon v. Array Sys. Corp.*, 325 F.3d 572, 577 (5th Cir. 2003).

Summary judgment is mandated if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to his case on which he bears the burden of proof at trial. *Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993); *Celotex Corp.*, 477 U.S. at 322; *EMCASCO Ins. Co.*, 438 F.3d at 523; *Cutrera v. Board of Supervisors of La. State Univ.*, 429 F.3d 108, 110 (5th Cir. 2005); *Patrick v. Ridge*, 394 F.3d 311, 315 (5th Cir. 2004). "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof

concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 322-23.

B.     Employment Discrimination Claims under the TCHRA

In the case at bar, Melanson asserts age discrimination claims against Covenant under the TCHRA. The TCHRA provides:

> An employer commits an unlawful employment practice if because of race, color, disability, religion, sex, national origin, or age the employer:
>
> (1) fails or refuses to hire an individual, discharges an individual, or discriminates in any manner against an individual in connection with compensation or the terms, conditions, or privileges of employment; or
>
> (2) limits, segregates, or classifies an employee or applicant for employment in a manner that would deprive or tend to deprive an individual of any employment opportunity or adversely affect in any other manner the status of an employee.

TEX. LAB. CODE ANN. § 21.051. "In enacting the TCHRA, the Legislature intended to correlate state law with federal law in employment discrimination cases." *M.D. Anderson Hosp. & Tumor Inst. v. Willrich*, 28 S.W.3d 22, 24 (Tex. 2000) (citing TEX. LAB. CODE ANN. § 21.001; *NME Hosps., Inc. v. Rennels*, 994 S.W.2d 142, 144 (Tex. 1999)); *accord Vielma v. Eureka Co.*, 218 F.3d 458, 462 (5th Cir. 2000); *Spinks v. TruGreen Landcare, L.L.C.*, 322 F. Supp. 2d 784, 791 (S.D. Tex. 2004); *Autozone, Inc. v. Reyes*, 272 S.W.3d 588, 592 (Tex. 2008); *Ysleta Indep. Sch. Dist. v. Monarrez*, 177 S.W.3d 915, 917 (Tex. 2005). "'Section 21.051 is substantively identical to the federal equivalent in Title VII, with the exception that' federal law makes age discrimination unlawful under the ADEA." *McClaren v. Morrison Mgmt.*, 420 F.3d 457, 461-62 (5th Cir. 2005) (quoting *Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 475 (Tex. 2001)); *see also Murphy v. Uncle Ben's, Inc.*, 168 F.3d 734, 739 (5th Cir. 1999).

Thus, in the absence of specific statutory language to the contrary, the TCHRA is construed in a manner consistent with federal laws prohibiting employment discrimination and the cases interpreting them. *See Pineda v. United Parcel Serv., Inc.*, 360 F.3d 483, 487 (5th Cir. 2004); *Quantum Chem. Corp.*, 47 S.W.3d at 476; *see also Daniels v. City of Arlington*, 246 F.3d 500, 507 (5th Cir.), *cert. denied*, 534 U.S. 951 (2001); *Georgen-Saad v. Texas Mut. Ins. Co.*, 195 F. Supp. 2d 853, 858 (W.D. Tex. 2002); *Grogan v. Savings of Am., Inc.*, 118 F. Supp. 2d 741, 747 (S.D. Tex.), *aff'd*, 202 F.3d 265 (5th Cir. 1999); *Willrich*, 28 S.W.3d at 24. Indeed, Texas courts considering TCHRA claims have noted that "[b]ecause the TCHRA seeks to promote federal civil rights policy and because Texas has little case law interpreting the TCHRA, it is proper to look to analogous federal precedent." *Fields v. Teamsters Local Union No. 988*, 23 S.W.3d 517, 524 (Tex. App.—Houston [1st Dist.] 2000, pet. denied); *accord Specialty Retailers, Inc. v. DeMoranville*, 933 S.W.2d 490, 492 (Tex. 1996); *Speer v. Presbyterian Children's Home & Serv. Agency*, 847 S.W.2d 227, 232 (Tex. 1993). Therefore, aside from instances in which the Texas Supreme Court has indicated to the contrary, the court analyzes a plaintiff's age discrimination claims under the TCHRA in the same manner as it would analyze a similar claim brought under the ADEA. *See Autozone, Inc.*, 272 S.W.3d at 592; *Evans v. City of Houston*, 246 F.3d 344, 349 (5th Cir. 2001); *Chavarria v. Despachos Del Notre, Inc.*, 390 F. Supp. 2d 591, 600 (S.D. Tex. 2005); *see also Quantum Chem. Corp.*, 47 S.W.3d at 474.

C.    Age Discrimination—General Burden of Proof

The ADEA provides that "it shall be unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C.

§ 623(a)(1); *see Reeves*, 530 U.S. at 141; *Berquist v. Washington Mut. Bank*, 500 F.3d 344, 349 (5th Cir. 2007), *cert. denied*, 128 S. Ct. 1124 (2008); *Coleman v. New Orleans & Baton Rouge S.S. Pilots' Ass'n*, 437 F.3d 471, 478 (5th Cir.), *cert. denied*, 548 U.S. 905 (2006); *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 308-09 (5th Cir. 2004). In essence, the ADEA makes it unlawful for an employee, who is at least forty years old, to be discharged or otherwise subjected to an adverse employment action because of his age. *See Rutland v. Moore*, 54 F.3d 226, 228 (5th Cir. 1995) (citing 29 U.S.C. §§ 623(a), 631(a)). "Congress expressly declared that the purposes of the ADEA were 'to promote employment of older persons based on their ability rather than age; to prohibit arbitrary age discrimination in employment; [and] to help employers and workers find ways of meeting problems arising from the impact of age on employment.'" *Wamsley v. Champlin Ref. & Chem., Inc.*, 11 F.3d 534, 541 (5th Cir. 1993), *cert. denied*, 514 U.S. 1037 (1995) (citing 29 U.S.C. § 621(b)). "When a plaintiff alleges disparate treatment, 'liability depends on whether the protected trait (under the ADEA, age) actually motivated the employer's decision.'" *Reeves*, 530 U.S. at 141 (quoting *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993)); *see Rachid*, 376 F.3d at 309. "That is, the plaintiff's age must have 'actually played a role in [the employer's decisionmaking] process and had a determinative influence on the outcome.'" *Reeves*, 530 U.S. at 141 (quoting *Hazen Paper Co.*, 507 U.S. at 610).

As with other types of employment discrimination, age discrimination may be demonstrated either through direct evidence or by an indirect or inferential method of proof. *See Berquist*, 500 F.3d at 356; *Rachid*, 376 F.3d at 309. "'Direct evidence is evidence that, if believed, proves the fact of discriminatory animus without inference or presumption.'" *West v. Nabors Drilling USA, Inc.*, 330 F.3d 379, 384 n.3 (5th Cir. 2003) (quoting *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d

893, 897 (5th Cir. 2002), *cert. denied*, 539 U.S. 926 (2003) (citing *Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1217 (5th Cir. 1995))); *accord Jones v. Robinson Prop. Group, LP*, 427 F.3d 987, 992 (5th Cir. 2005). "Absent direct evidence of discriminatory intent, as is typically the case, proof via circumstantial evidence is assembled using the framework set forth in the seminal case of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 . . . (1973)." *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir. 2000); *see Reeves*, 530 U.S. at 142-43; *Nasti v. CIBA Specialty Chems. Corp.*, 492 F.3d 589, 593 (5th Cir. 2007); *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 346 (5th Cir. 2007); *Wheeler v. BL Dev. Corp.*, 415 F.3d 399, 405 (5th Cir.), *cert. denied*, 546 U.S. 1061 (2005). This method of analysis is utilized for both Title VII and ADEA claims. *See Hagan v. Echostar Satellite, LLC*, 529 F.3d 617, 624 (5th Cir. 2008); *Russell*, 235 F.3d at 222 n.3; *Faruki v. Parsons S.I.P., Inc.*, 123 F.3d 315, 318 (5th Cir. 1997); *Woodhouse v. Magnolia Hosp.*, 92 F.3d 248, 252 n.3 (5th Cir. 1996); *Meinecke v. H&R Block*, 66 F.3d 77, 83 (5th Cir. 1995). "The same evidentiary procedure for allocating burdens of production and proof applies to discrimination claims under both statutes." *Bauer v. Albemarle Corp.*, 169 F.3d 962, 966 (5th Cir. 1999) (citing *Meinecke*, 66 F.3d at 83).

Where, as here, there is no direct evidence of discrimination, the plaintiff must initially establish a *prima facie* case by satisfying a multi-factor test from which a discriminatory motive may be inferred, thus creating a rebuttable presumption of intentional discrimination. *See Reeves*, 530 U.S. at 142-43; *Alvarado v. Texas Rangers*, 492 F.3d 605, 611 (5th Cir. 2007); *Turner*, 476 F.3d at 345; *Bryant v. Compass Group USA Inc.*, 413 F.3d 471, 475 n.3 (5th Cir. 2005), *cert. denied*, 546 U.S. 1090 (2006); *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003); *Russell*, 235 F.3d at 222. "'To establish a *prima facie* case, a plaintiff need only make a very minimal

showing.'" *Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 41 (5th Cir. 1996) (quoting *Thornbrough v. Columbus & Greenville R.R. Co.*, 760 F.2d 633, 639 (5th Cir. 1985)); *accord Bauer*, 169 F.3d at 967.

Once the plaintiff establishes a *prima facie* case, the burden then shifts to the defendant to articulate—but not prove—a legitimate, nondiscriminatory reason for its employment decision. *Raytheon Co. v. Hernandez*, 540 U.S. 44, 49 n.3 (2003); *Reeves*, 530 U.S. at 142; *McDonnell Douglas Corp.*, 411 U.S. at 802; *Fahim v. Marriott Hotel Servs., Inc.*, 551 F.3d 344, 349 (5th Cir. 2008); *Alvarado*, 492 F.3d at 611; *Nasti*, 492 F.3d at 593; *Turner*, 476 F.3d at 345; *Willis v. Coca Cola Enters., Inc.*, 445 F.3d 413, 420 (5th Cir. 2006); *Baker v. American Airlines, Inc.*, 430 F.3d 750, 753 (5th Cir. 2005). "This burden is one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves*, 530 U.S. at 142 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)); *accord Alvarado*, 492 F.3d at 611; *West*, 330 F.3d at 384-85; *Sandstad*, 309 F.3d at 898; *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 902 (5th Cir. 2000). "The [employer] must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, '*if believed by the trier of fact*,' would support a finding that unlawful discrimination was not the cause of the employment action." *Bauer*, 169 F.3d at 966 (quoting *Hicks*, 509 U.S. at 507) (emphasis in original)); *accord Brown v. Bunge Corp.*, 207 F.3d 776, 781 (5th Cir. 2000).

If the employer meets its burden, "'the *McDonnell Douglas* framework—with its presumptions and burdens'—disappear[s], . . . and the sole remaining issue [is] 'discrimination vel non.'" *Reeves*, 530 U.S. at 142-43 (quoting *Hicks*, 509 U.S. at 510; *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714 (1983)); *see Nasti*, 492 F.3d at 593;

*Wheeler*, 415 F.3d at 405; *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 350 (5th Cir. 2005); *Laxton*, 333 F.3d at 578; *West*, 330 F.3d at 385. "Although intermediate evidentiary burdens shift back and forth under this framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Reeves*, 530 U.S. at 143 (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)); *accord Hicks*, 509 U.S. at 507; *Nasti*, 492 F.3d at 593; *Baker*, 430 F.3d at 753-54; *Wheeler*, 415 F.3d at 405; *Laxton*, 333 F.3d at 578; *Vadie v. Mississippi State Univ.*, 218 F.3d 365, 372 (5th Cir. 2000), *cert. denied*, 531 U.S. 1150 (2001).

In attempting to satisfy this burden, under the modified *McDonnell Douglas* approach, the plaintiff must offer sufficient evidence to create a genuine issue of material fact "'"either (1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another "motivating factor" is the plaintiff's protected characteristic (mixed-motive[s] alternative).'"" *Rachid*, 376 F.3d at 312 (quoting *Rishel v. Nationwide Mut. Ins. Co.*, 297 F. Supp. 2d 854, 865 (M.D.N.C. 2003) (quoting *Dunbar v. Pepsi-Cola Gen. Bottlers of Iowa, Inc.*, 285 F. Supp. 2d 1180, 1198 (N.D. Iowa 2003))); *accord Fahim*, 551 F.3d at 349; *Berquist*, 500 F.3d at 356; *Keelan v. Majestic Software, Inc.*, 407 F.3d 332, 341 (5th Cir. 2005). Likewise, to prevail under the TCHRA, the plaintiff need only establish that discrimination "'was a motivating factor for an employment practice, even if other factors also motivated the practice.'" *Quantum Chem. Corp.*, 47 S.W.3d at 479-80 (quoting TEX. LAB. CODE ANN. § 21.125(a)). If the plaintiff demonstrates that age was a "motivating factor" in the employment decision, the defendant must then prove "'that the same adverse employment decision would have been made regardless of

discriminatory animus.'" *Keelan,* 407 F.3d at 341(quoting *Rachid*, 376 F.3d at 312); *accord Machinchick*, 398 F.3d at 352. The plaintiff will prevail if the employer fails to carry this burden. *Keelan*, 407 F.3d at 341; *Machinchick*, 398 F.3d at 352; *Rachid*, 376 F.3d at 312.

Under the pretext alternative approach, the "plaintiff may establish pretext either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or 'unworthy of credence.'" *Laxton*, 333 F.3d at 578 (citing *Reeves*, 530 U.S. at 143; *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 220 (5th Cir. 2001)). "An explanation is false or unworthy of credence if it is not the real reason for the adverse employment action." *Id.* (citing *Sandstad*, 309 F.3d at 899). "[I]t is *permissible* for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." *Reeves*, 530 U.S. at 147 (emphasis in original); *accord Bryant*, 413 F.3d at 476; *Kanida v. Gulf Coast Med. Pers. LP*, 363 F.3d 568, 574 (5th Cir. 2004); *West*, 330 F.3d at 385; *Ratliff v. City of Gainesville*, 256 F.3d 355, 360 (5th Cir. 2001).

"Evidence demonstrating that the employer's explanation is false or unworthy of credence, taken together with the plaintiff's prima facie case, is likely to support an inference of discrimination without further evidence of defendant's true motive." *Laxton*, 333 F.3d at 578 (citing *Sandstad*, 309 F.3d at 897); *accord Machinchick*, 398 F.3d at 351; *Russell*, 235 F.3d at 223 (citing *Reeves*, 530 U.S. at 147-48). "'[O]nce the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision.'" *Id.* (quoting *Reeves*, 530 U.S. at 147); *accord Laxton*, 333 F.3d at 578; *West*, 330 F.3d at 385. Hence, the plaintiff need not, as a matter of course, introduce additional, independent evidence of

discrimination to avoid summary judgment. *See Reeves*, 530 U.S. at 148; *Ratliff*, 256 F.3d at 361-62; *Blow v. City of San Antonio*, 236 F.3d 293, 298 (5th Cir. 2001); *Russell*, 235 F.3d at 223. Ultimately, "[w]hether summary judgment is appropriate depends on numerous factors, including 'the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case'" that properly may be considered by the court when ruling on a motion for summary judgment. *Price v. Federal Express Corp.*, 283 F.3d 715, 720 (5th Cir. 2002) (quoting *Reeves*, 530 U.S. at 148-49); *accord Machinchick*, 398 F.3d at 351 n.14; *Laxton*, 333 F.3d at 579; *Crawford*, 234 F.3d at 902.

D.     Discriminatory Discharge

1.     *Prima Facie* Case

To establish a *prima facie* case of discriminatory discharge under the TCHRA or the ADEA, the plaintiff must show that:

(1) he is a member of the protected class—age forty or older;

(2) he was qualified for the position he held;

(3) he was discharged; and

(4) he was replaced by someone outside the protected class; he was replaced by someone younger; or he was otherwise discharged because of his age.

*See Reeves*, 530 U.S. at 142; *Berquist*, 500 F.3d at 349; *Machinchick*, 398 F.3d at 350; *Rachid*, 376 F.3d at 309; *Palasota v. Haggar Clothing Co.*, 342 F.3d 569, 576 (5th Cir. 2003), *cert. denied*, 540 U.S. 1184 (2004). "Replacement of an employee within the protected class—age 40 or older—with an employee outside the protected class—age 39 or younger—constitutes a clear violation under the *McDonnell Douglas* test provided there is a sufficient difference in the age of the two parties." *Fields v. J.C. Penney Co., Inc.*, 968 F.2d 533, 536 n.2 (5th Cir. 1992). In

addition, "*Burdine* has been reasonably interpreted to require a plaintiff to show that he was replaced by a worker sufficiently younger in the context of his employment to permit an inference of age discrimination." *Bienkowski v. American Airlines, Inc.*, 851 F.2d 1503, 1506 (5th Cir. 1988).

Here, Covenant does not dispute that Melanson has presented a *prima facie* case of age discrimination under the ADEA. At the time of his termination, Melanson was forty-seven years old and well-qualified for his position as a canine trainer. Further, according to Humphrey, Melanson's replacement was in his early to mid-thirties. Thus, as conceded by Covenant, Melanson has satisfied his initial burden of production.

2.    <u>Nondiscriminatory Reason for Termination</u>

Because Melanson has established a *prima facie* case of age discrimination, to avoid liability, Covenant must set forth an adequate, nondiscriminatory reason for his termination. Once a plaintiff establishes a *prima facie* case of discrimination, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *See Reeves*, 530 U.S. at 142; *Hicks*, 509 U.S. at 506-07; *Fahim*, 551 F.3d at 349; *Alvarado*, 492 F.3d at 611; *Turner*, 476 F.3d at 345; *Bryant*, 413 F.3d at 475 n.3; *Laxton*, 333 F.3d at 578. "The purpose of this step is 'to force the defendant to give an explanation for its conduct, in order to prevent employers from simply remaining silent while the plaintiff founders on the difficulty of proving discriminatory intent.'" *Stratton v. Department for the Aging for the City of N.Y.*, 132 F.3d 869, 879 (2d Cir. 1997) (quoting *Fisher v. Vassar Coll.*, 114 F.3d 1332, 1336 (2d Cir. 1997), *cert. denied*, 522 U.S. 1075 (1998)). "The employer need not persuade the court that it was motivated by the reason it provides; rather, it must simply articulate an explanation that, if

17

true, would connote lawful behavior." *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 52 (2d Cir. 1998) (emphasis omitted); *accord Nasti*, 492 F.3d at 593 (citing *Burdine*, 450 U.S. at 254); *Patrick*, 394 F.3d at 315; *Williams*, 98 F.3d at 181; *Acevedo-Diaz v. Aponte*, 1 F.3d 62, 67 (1st Cir. 1993). Hence, the defendant's burden is relatively light. *See Greenway*, 143 F.3d at 52.

"If the employer produces any evidence 'which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action,' then the employer has satisfied its burden of production." *Daigle v. Liberty Life Ins. Co.*, 70 F.3d 394, 396 (5th Cir. 1995) (quoting *Hicks*, 509 U.S. at 509); *accord Price*, 283 F.3d at 720. "The employer's stated legitimate reason must be reasonably articulated and nondiscriminatory, but does not have to be a reason that the judge or jurors would act on or approve." *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1012 n.6 (1st Cir. 1979); *accord Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1187 (11th Cir. 1984). Indeed, even an employer's "'incorrect belief that an employee's performance is inadequate constitutes a legitimate, nondiscriminatory reason.'" *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1091 (5th Cir. 1995) (quoting *Little v. Republic Refining Co., Ltd.*, 924 F.2d 93, 97 (5th Cir. 1991)). The articulated reason, however, must be both "'clear and reasonably specific.'" *Okoye v. University of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 513 (5th Cir. 2001) (quoting *Burdine*, 450 U.S. at 258); *see Alvarado*, 492 F.3d at 616; *Gallo v. Prudential Residential Servs. Ltd. P'ship*, 22 F.3d 1219, 1226 (2d Cir. 1994). Furthermore, it "'must be legally sufficient to justify a judgment for the [employer].'" *Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 161 (1st Cir. 1998) (quoting *Burdine*, 450 U.S. at 255); *accord Patrick*, 394 F.3d at 319 n.34. If the defendant sustains its burden of production, "the presumption raised by the plaintiff's prima facie case essentially disappears, and the plaintiff is

left with the ultimate burden which has never left him: that of proving that the defendant intentionally discriminated against him." *Tanik v. Southern Methodist Univ.*, 116 F.3d 775, 776 (5th Cir.), *cert. denied*, 522 U.S. 1015 (1997); *accord Reeves*, 530 U.S. at 143; *Nasti*, 492 F.3d at 593; *Wheeler*, 415 F.3d at 405; *Laxton*, 333 F.3d at 578; *Sandstad*, 309 F.3d at 897.

In the case at bar, Covenant has set forth a legitimate, nondiscriminatory reason for terminating Melanson's employment. Covenant maintains that Melanson was discharged for violating proper training aid inventory procedure after previously receiving two written warnings for misconduct. The notification presented to Melanson confirms this assertion, stating that "[w]ritten procedure requires a 100% inventory of all explosive aids every time training aids are removed from the magazine." Hence, Covenant has articulated a specific reason—other than age—for terminating Melanson, which permits the conclusion that such action was not based on discriminatory animus and satisfies Covenant's burden of production.

### 3. Pretext

Because Covenant has carried its burden of articulating a legitimate, nondiscriminatory reason for its actions, to prevail, Melanson "'must provide some evidence, direct or circumstantial, to rebut each of the employer's proffered reasons and allow the jury to infer that the employer's explanation was a pretext for discrimination.'" *Rutherford v. Harris County*, 197 F.3d 173, 184 (5th Cir. 1999) (quoting *Scott v. University of Miss.*, 148 F.3d 493, 504 (5th Cir. 1998)); *see Reeves*, 530 U.S. at 143; *Hicks*, 509 U.S. at 507-08; *McDonnell Douglas Corp.*, 411 U.S. at 804; *Machinchick*, 398 F.3d at 351; *Laxton*, 333 F.3d at 578; *West*, 330 F.3d at 385; *Sandstad*, 309 F.3d at 897. Pretext may be established "'either through evidence of disparate treatment or by showing that the employer's explanation is false or 'unworthy of credence.'"

*Nasti*, 492 F.3d at 593 (quoting *Laxton*, 333 F.3d at 578). Nevertheless, "the plaintiff always bears the burden of 'persuading the trier of fact that the defendant intentionally discriminated' against [him]." *Kanida*, 363 F.3d at 575 n.5 (quoting *Reeves*, 530 U.S. at 143); *see also Nasti*, 492 F.3d at 593; *Baker*, 430 F.3d at 753-54; *Bryant*, 413 F.3d at 476 n.3. "To satisfy this burden, a plaintiff must produce substantial evidence that the employer's proffered reasons for its actions were a pretext for discrimination." *Nasti*, 492 F.3d at 593; *accord Laxton*, 333 F.3d at 578.

"While the presumption of discrimination is no longer operative once the employer meets its burden of production, "the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom'" may still be considered "'on the issue of whether the defendant's explanation is pretextual.'" *Reeves*, 530 U.S. at 143 (quoting *Burdine*, 450 U.S. at 255 n.10); *see Laxton*, 333 F.3d at 582. Further, if "the evidence of pretext is substantial, the plaintiff may create a genuine issue of material fact without independent evidence that discrimination was the real reason for the adverse employment action." *Crawford*, 234 F.3d at 903 (citing *Walton v. Bisco Indus., Inc.*, 119 F.3d 368, 372 (5th Cir. 1997)); *see Reeves*, 530 U.S. at 143; *Laxton*, 333 F.3d at 585. Nevertheless, "discrimination suits still require evidence of discrimination." *Rubinstein v. Adminstrators of the Tulane Educ. Fund*, 218 F.3d 392, 400 (5th Cir. 2000), *cert. denied*, 532 U.S. 937 (2001); *accord Ratliff*, 256 F.3d at 360-61; *Ganheart v. Xavier Univ. Of La.*, No. 07-9703, 2009 WL 24227, at *11 (E.D. La. Jan. 2, 2009). "[T]he question for summary judgment is whether a rational fact finder could find that the employer discriminated against the plaintiff[] . . . ." *Pratt v. City of Houston*, 247 F.3d 601, 606 (5th Cir. 2001), *cert. denied*, 540 U.S. 1005 (2003) (citing *Hicks*, 509 U.S. at 511).

"On summary judgment . . . the plaintiff must substantiate his claim of pretext through evidence demonstrating that discrimination lay at the heart of the employer's decision." *Price*, 283 F.3d at 720; *accord Franklin v. Boeing Co.*, 232 F. App'x 408, 410 (5th Cir. 2007); *Rubinstein*, 218 F.3d at 400; *Holmes v. Drug Enforcement Admin.*, 512 F. Supp. 2d 826, 844 (W.D. Tex. 2007). Hence, the plaintiff's assertion of pretext must be supported by more than mere self-serving, subjective, or speculative allegations; a plaintiff must provide sufficiently specific, substantive reasons for his claim of pretext. *See Aryain v. Wal-Mart Stores Tex. LP*, 534 F.3d 473, 487 (5th Cir. 2008); *Auguster v. Vermillion Parish Sch. Bd.*, 249 F.3d 400, 403 (5th Cir. 2001); *Bauer*, 169 F.3d at 967. If the evidence presented is "not so persuasive so as to support an inference that the real reason was discrimination," then the plaintiff has failed to meet his burden. *Rubinstein*, 218 F.3d at 400; *accord Price*, 283 F.3d at 724. "Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory." *Reeves*, 530 U.S. at 148; *accord West*, 330 F.3d at 385; *Price*, 283 F.3d at 720; *Okoye*, 245 F.3d at 514; *Smith v. Hewlett-Packard Co.*, 512 F. Supp. 2d 587, 601 (N.D. Tex. 2007). For example, summary judgment would be appropriate "if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." *Reeves*, 530 U.S. at 148; *accord Burrell v. Dr. Pepper/Seven Up Bottling Group, Inc.*, 482 F.3d 408, 415 (5th Cir. 2007); *Machinchick*, 398 F.3d at 351 n.14; *Smith*, 512 F. Supp. at 601-02.

a.      <u>Written Inventory Procedure</u>

In the case at bar, Melanson argues that Covenant's stated reason for terminating his employment—failing to inventory training aids properly—is merely a pretext for age discrimination.  Specifically, Melanson contests the portion of his final written disciplinary form that states "[w]ritten procedure requires a 100% inventory of all explosive aids every time training aids are removed from the magazine."  Melanson contends that there were no written inventory procedures in effect at the time of his discharge.  As a consequence, Melanson asserts that Covenant's articulated reason for the adverse employment action taken against him is unworthy of credence.

As noted by Covenant, however, the record indicates that a broad, written inventory policy was in effect at the Big Hill site in December 2006 when Melanson was terminated.  Before Covenant assumed responsibility for security in 2005, Covenant's predecessor, Pinkerton, approved "Storage, Handling and Transportation Requirements for K9 Explosive Training Aids," which provide, in relevant part, "[a] complete inventory of all training aids in the magazine will be conducted when any material is returned."  According to Covenant Vice President and General Manager Anthony Shepherd's unrefuted affidavit:

> When Covenant took over as security contractor at the SPR, it adopted and applied all of the predecessors', to include PGS', policies, procedures and standing orders until Covenant drafted specific replacement policies, procedures and standing orders and each specific policy, procedure or standing order was approved by DynMcDermott and the DOE.  This adoption of the predecessors', policies and procedures included PGS' Storage, Handling and Transportation Requirements for K-9 Explosive Aids.

At deposition, DynMcDermott Big Hill Site Director Tim Lewis ("Lewis") confirmed that this type of policy adoption is typical for newly hired contractors.

Multiple Covenant employees also testified that they understood the Pinkerton inventory policy to apply at the time of Melanson's termination. For example, Humphrey, one of the plaintiff's key witnesses, admitted the following understanding:

> Q:    . . . When Covenant took over, did Covenant continue to use PGS's procedures?
>
> A:    They were using them until [DynMcDermott] told [them] not to use them anymore.
>
> Q:    Okay. So PGS had procedures concerning doing inventories?
>
> A:    Yes, sir.
>
> Q:    Okay. And when an item is taken out of the magazine to be used for training, is the canine officer, canine specialist supposed to do 100 percent inventory when it quits with that?
>
> A:    Yes, sir.
>
> Q:    And that didn't change between PGS and Covenant?
>
> A:    No, sir.

Even Melanson acknowledged at deposition that his inventory methodology remained the same after Covenant replaced Pinkerton at the Big Hill site.

> Q:    . . . Under PGS was it their policy that a complete inventory of all training aids in the magazine will be conducted when any materials return?
>
> A:    Yes, sir, there is.
>
> Q:    Under PGS?
>
> A:    Yes, sir.
>
> Q:    Okay. So under PGS you had to do a complete inventory when any item was returned to the magazine?
>
> A:    Yes sir, which we did.
>
> Q:    Okay. Did somebody tell you to stop doing that when [Covenant] took over?
>
> A:    Doing what?
>
> Q:    Doing a complete inventory when something was returned to the magazine.
>
> A:    I did a complete inventory when I pulled it out for them. I inventoried the same way with Pinkerton that I did with them. My 100 percent inventory is whatever I took out I made 100 percent was put back. That's my 100 percent inventory. That's not the same as a monthly.

At the time of Melanson's discharge in December 2006, Covenant was still awaiting final approval of step-by-step instructions delineating how its canine explosive training aids inventory

policy should be implemented.[2] Covenant's "Storage, Handling, & Transportation Requirements for Canine Explosives Training Aids," was not approved by DynMcDermott and the DOE until February 15, 2007. Training regarding this document's definition of a complete inventory was also not provided until after Melanson's termination. Nonetheless, Melanson was never accused of violating any specific procedure described in Covenant's new procedures manual. Rather, Melanson was discharged for failing to conduct a complete inventory pursuant to the Pinkerton policy still in effect at the site. Moreover, to the extent Melanson contends that Covenant acted harshly in terminating his employment when specific interpretative procedures and additional training had not yet been provided to Covenant employees, complaints that a particular employment decision was unfair are insufficient to establish pretext. The ADEA "does not take away an employer's right to interpret its rules as it chooses, and to make determinations as it sees fit under those rules." *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir. 1984). "Like other anti-discrimination laws, the ADEA deals only with *discrimination*." *Monroe v. Children's Home Ass'n of Ill.*, 128 F.3d 591, 593 (7th Cir. 1997) (emphasis in original). Hence, the ADEA, and, similarly, the TCHRA, "is not a shield against harsh treatment in the workplace; it protects only in instances of harshness disparately distributed." *Jackson v. City of Killeen*, 654 F.2d 1181, 1186 (5th Cir. 1981); *accord Roberts v. Unitrin Specialty Lines Ins. Co.*,

___

[2] In his response, Melanson identifies portions of multiple depositions as well as an e-mail authored by DOE Protection Program and Physical Security Manager Jordan Jones, which he argues contradict Covenant's representation that it adopted Pinkerton's complete inventory requirement prior to his termination. The statements and correspondence, however, reference such things as "definitive guidance," "detailed policy," or "K9 Explosive Training Aids Procedures," which Covenant admits were not adopted until after Melanson was discharged. Similarly, the testimony of Allan Fruge, the most senior DOE official at the Big Hill site, merely indicates that he never received a written copy of Covenant's inventory policy.

No. 06-CV-0380-B, 2008 WL 3832223, at *12 (N.D. Tex. Aug. 14, 2008); *Caesar v. North Star Steel Tex., Inc.*, 69 F. Supp. 2d 858, 867 (E.D. Tex. 1999).

Here, Melanson has provided insufficient evidence of disparate treatment in reference to Covenant's inventory policy. Indeed, the record shows that Melanson was not the only Covenant employee to be disciplined in connection with the missing fuse incident. Parrish, whose age was not provided, also received a written warning on December 21, 2006, stating that he "violated proper inventory procedures when he failed to ensure accountability of all K9 training aids upon completion of canine training." Like the form issued to Melanson, the warning advises, "[w]ritten procedure requires a 100% inspection of all training aids anytime items are returned to the explosive magazine." Unlike Melanson, however, the warning notes that Parrish had not been the subject of previous disciplinary action. Accordingly, Parrish was not discharged for his failure to ensure that a proper inventory was performed.

At deposition, Humphrey claimed that Covenant should have disciplined Lesak instead of Parrish. Humphrey asserted that Lesak, and not Parrish, was the supervisor with Melanson when the safety fuse was lost. In order to introduce evidence of disparate treatment, however, a plaintiff must show "'that the misconduct for which [he] was discharged was nearly identical to that engaged in by a[n] employee [not within [his] protected class] whom [the company] retained.'" *Wallace*, 271 F.3d at 221 (quoting *Smith v. Wal-Mart Stores (No. 471)*, 891 F.2d 1177, 1180 (5th Cir. 1990) (alterations added and in original); *accord Ramirez v. Gonzalez*, 225 F. App'x 203, 207 (5th Cir. 2007); *see also Taylor v. United Parcel Serv., Inc.*, 554 F.3d 510, 523 (5th Cir. 2008); *Bryant*, 413 F.3d at 478; *Perez v. Texas Dep't of Crim. Justice*, 395 F.3d 206, 210 (5th Cir. 2004), *cert. denied*, 546 U.S. 976 (2005) (emphasizing that assessment of similarity of employees

must be viewed from employer's perspective). In its investigation, Covenant was unable to pinpoint the exact date on which the fuse from canister nine was left outside. Indeed, neither Humphrey nor Melanson has proffered any evidence demonstrating that Lezak was involved in the events leading up to the misplacement of the fuse. Additionally, Melanson has not shown that Lesak is outside of the protected class. Instead, Humphrey merely indicates that Lesak is "younger" than Melanson. This portion of Humphrey's deposition testimony, therefore, is insufficient to demonstrate that Covenant's stated reason for his termination is pretextual.[3]

### 2. Internal Investigation

Melanson also attempts to discredit Covenant's articulated rationale for its adverse employment decision by casting suspicion on Covenant's internal investigation of the misplaced fuse incident. Specifically, Melanson questions the manner in which Covenant assigned responsibility for determining the root cause of the missing training aid. SPR Safety and Quality Assurance Specialist James McCartney ("McCartney") initially commenced the investigation. A few days after he began his inquiry, however, McCartney received notification that all investigative duties were being reassigned to Frank Willingham ("Willingham"), a corporate consultant. Melanson argues that this personnel change was effectuated in order to conceal Covenant's lack of written inventory procedures as well as its true reason for terminating his employment.

---

[3] The court also notes that Covenant submitted a written warning that was issued to Lezak in connection with the August 2006 missing key incident. Although not a deciding factor in determining if Lezak received preferential treatment here, Humphrey's implication that Lezak's age insulated him from disciplinary action following the missing fuse incident is belied by the fact that he received written discipline just a few months earlier for failing to confirm that Melanson had returned an armory key.

Looking to Willingham's report, however, the court finds no evidence of intentional deception or mendacity. In his comprehensive report, Willingham describes conducting a thorough investigation of the missing fuse incident, which included interviewing numerous witnesses, reviewing all relevant documentation, performing several tests, and examining multiple allegations raised by various Covenant employees. The twelve-page report also provides a detailed summary of Willingham's resulting factual findings. From these ascertained facts, which are consistent with the undisputed facts now before the court, Willingham opines that "[t]he root causes of this incident were inadequate inventory procedures, canine handler complacency, and inadequate training for supervisors who witnessed the conduct of inventories." Willingham notes that when any canine specialist returns any training aid to storage, "he is required to do a complete inventory on <u>all</u> explosive training aids stored in the magazine."[4] His report recommends that Covenant implement fourteen listed corrective actions as soon as possible in order to prevent future training aid loss and facilitate earlier discovery of inventory discrepancies.

Melanson makes much of the fact that Willingham's final report is not identical to a draft report prepared by McCartney before he was removed from the investigation. In particular, Melanson contends that Willingham failed to incorporate McCartney's statements highlighting Covenant's lack of step-by-step inventory procedures and related training. Covenant, however, has never disputed that its training aid procedural manual did not receive final corporate approval until after Melanson's termination. Furthermore, as discussed above, Willingham's report clearly

---

[4] Willingham incorrectly cites the source of this corporate policy as Paragraph 4.4.1.4 of Covenant's "Storage, Handling, & Transportation Requirements for Canine Explosives Training Aids," which Covenant concedes had not yet received final approval at the time Willingham's report was written. Given that Paragraph 4.4.1.4 is nearly identical to the Pinkerton training aid inventory policy, however, this inconsistency is immaterial.

identifies inadequate inventory procedures and training as root causes of the missing fuse incident. Willingham explicitly recommends that Covenant:

> Expand post orders and other procedures to clearly identify how a thorough inventory should be conducted. This means physically seeing and counting every training aid inside their containers. It does not mean inventorying only the aids that were used. It requires opening the boxes and removing each aid if necessary to ensure accountability.

Willingham also advises Covenant to "[e]nter details on how an effective inventory is conducted into training lesson plans." Hence, Melanson's assertion that the Willingham report intentionally ignored McCartney's previous findings regarding discrete instructions and additional training is belied by the facts.

Moreover, Covenant has provided a reasonable explanation for the decision to remove McCartney from the investigation. The record shows that the impetus for the substitution of investigators was an independent recommendation from DynMcDermott. At deposition, DynMcDermott Site Director Lewis acknowledged initiating the personnel change.

> A:     . . . I actually had Mr. McCartney removed from the investigation.
> Q:     Okay. And did you personally have him removed from the investigation?
> A:     No. Well, probably; and I say that because I was — I was told and later I found out erroneously that he had a relationship with Barton Smith, that I thought there was a very real possibility of conflict of interest. I called Duane Johnson ["Johnson"], who is the director of security in New Orleans, and told him that I thought it would be good to have him removed for that reason. It wasn't until probably six months, maybe — maybe more, that Mr. McCartney did come into my office; and no one ever bothered to tell me that I was wrong. He told me. I sent out a public apology to everyone because I had him removed from — from that investigation.

Based on this perceived conflict of interest, Johnson of DynMcDermott "requested that [Covenant] reassign the investigation to a higher level than the original tasking to their OA staff lead Jim McCartney." In an e-mail dated December 6, 2006, Johnson advised Covenant management,

"[a]s this investigation may grow towards the Captain's actions, as well as a Lt and a Sgt, it is more appropriate to reassign to a higher companion level and push for additional root cause details." Covenant subsequently acted on DynMcDermott's recommendation and dispatched Willingham to the Big Hill site. Melanson fails to provide any evidence demonstrating that this proffered explanation of the events leading to McCartney's replacement is false or suspect. Thus, like his allegations that Covenant had no inventory policy at the time of his termination, Melanson's conspiracy theory concerning Covenant's internal investigation is wholly unsupported by the record.

### 3.    Humphrey Deposition

Lastly, although he maintains that any additional evidence of age-based discrimination is superfluous, Melanson tenders Humphrey's deposition testimony as further support for his contention that Covenant's stated reason for his discharge is pretextual. At deposition, Humphrey alleged that Covenant intentionally discriminated against older workers by instituting new physical fitness requirements that favored younger employees.

> Q:    In your time out here, have you seen qualified officers being overlooked for promotions due to the fact that Barton Smith wants certain officers over others?
>
> * * *
>
> A:    Yes, sir.
> Q:    Tell me about that.
> A:    I was one of them.
> Q:    Okay do you think that there is a reason related to age because of that?
> A:    Well, all I know is that they wanted a new younger elite force.
> Q:    And when did that first come about, this desire for a new younger elite force?
> A:    Whenever they started — wanted to go back to the mile run for everybody, SPO2's, and they wanted an elite force.
> Q:    Did you ever hear the phrase "elite force" while Pinkerton was there?
> A:    No, sir.

> Q: The phrase "elite force" was only used first when Covenant came onto the site; is that correct?
> A: Yes, sir.
> Q: That would have been the fall of 2005?
> A: Yes, sir.
> Q: Certainly a lot cheaper for Covenant to hire a 20-year old kid than it is to pay somebody like you?
> A: Yes, sir.

In support of this notion, Humphrey explained that he was once demoted for failing to notify others that security cameras were down and that he was replaced with Sergeant Brandon Smith ("Sgt. Smith"), a thirty-year-old employee who had previously received several reprimands for "calling off" without adequate notice.

Melanson argues that this testimony independently supports his belief that Covenant was intentionally reducing its older workforce. Humphrey's allegations and speculations, however, fail to support Melanson's pretext argument. First, even if Melanson were able to substantiate Humphrey's claim that Sgt. Smith received preferential treatment by demonstrating that another employee within the protected class was eligible for the position or identifying company policy stating that Sgt. Smith was ineligible for promotion, any consideration of such evidence would be misplaced. "Anecdotes about other employees cannot establish that discrimination was a company's standard operating procedure unless those employees are similarly situated to the plaintiff." *Wyvill v. United Cos. Life Ins. Co.*, 212 F.3d 296, 302 (5th Cir. 2000), *cert. denied*, 531 U.S. 1145 (2001); *see also Berquist*, 500 F.3d at 353. Here, Melanson held a different position and was assigned different responsibilities than Humphrey or Sgt. Smith. *See Ramirez*, 225 F. App'x at 207-08 (holding that employees filling different positions with different job duties are not similarly situated). Further, according to Humphrey's version of the events, he, Melanson, and Sgt. Smith were each disciplined for purportedly violating different company

policies.  *See Smith v. Wal-Mart Stores (No. 471)*, 891 F.2d 1177, 1180 (5th Cir. 1990) (finding that employees who engage in different violations of company policy are not similarly situated); *see also Perez*, 395 F.3d at 213; *Sagaral v. Wal-Mart Stores Tex. LP*, 516 F. Supp. 2d 782, 799 (S.D. Tex. 2007).  Thus, any comparison concerning the respective situations of these employees is not probative of whether age was a determinative factor in Melanson's termination.

Secondly, Humphrey's accusation that Covenant was unlawfully attempting to create an "elite force" by replacing older employees also fails.  Like the decision to replace McCartney in the missing fuse investigation, Covenant has presented ample, uncontroverted evidence that it was not the party responsible for determining that more stringent physical fitness requirements were necessary for some petroleum reserve security officers at the Big Hill site.  As Campbell explained at deposition, the DOE implemented this policy change nationwide in 2006.

Q:      . . . Are you aware of a policy to change the physical training requirements in Covenant?
A:      Yes.  At one time there was — Department of Energy had mandated that we would all become — SPO-2, I believe was the level, but we had to complete a mile run versus a half mile run.

In a letter to Congressman Richard H. Baker dated August 11, 2006, DOE Director of the Office of Security and Safety Performance Assurance explained that although the DOE valued experience, it felt that it was "essential . . . that SPO posts designated as offensive be staffed by personnel who can meet rigorous standards."  To meet this objective, the DOE issued a new *Protective Force Manual* (DOE M 470.4-3, Change 1), which required Covenant and other petroleum reserve facilities to apply one-mile run fitness standards to all SPO-II active or offensive combatant officers.  Melanson proffers no deposition testimony or other evidence that refutes this justification for the changes implemented in Covenant's fitness requirements.  Moreover,

Melanson has not shown that he was terminated or reprimanded for failing to fulfill fitness requirements. Consequently, Humphrey's deposition testimony, like Melanson's allegations regarding Covenant's written inventory policy and its internal investigation of the missing fuse incident, fails to demonstrate that Covenant's state reason for Melanson's discharge was pretextual or that Melanson's age played any role in his termination.

In the final analysis, Melanson and Humphrey's subjective perceptions of discrimination are all that remain. It is well established, however, that an employee's own subjective belief of discrimination, no matter how genuine, cannot serve as the basis for judicial relief. *Bauer*, 169 F.3d at 967; *see Moore v. Solar Group*, No. 08-60972, 2009 WL 423926, at *2 (5th Cir. Feb. 20, 2009); *Aryain*, 534 F.3d at 487; *Haley v. Alliance Compressor LLC*, 391 F.3d 644, 651 (5th Cir. 2004); *Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 654 (5th Cir. 2004); *Tyler v. Union Oil Co.*, 304 F.3d 379, 395 (5th Cir. 2002). Melanson's "bald assertions of age discrimination are inadequate to permit a finding that proscribed discrimination motivated" an employer's conduct. *Ray v. Tandem Computers, Inc.*, 63 F.3d 429, 435 (5th Cir. 1995); *accord Allen v. Solo Cup Co.*, No. 3:05-CV-0848-R, 2006 WL 1949455, at *10 (N.D. Tex. July 13, 2006). Moreover, the subjective belief of a fellow employee, whether a supervisor or coworker, suffers from the same defects as the plaintiff's subjective belief. *See Little*, 924 F.2d at 96; *McConnell v. Thomson Newspapers, Inc.*, 802 F. Supp. 1484, 1504 n.26 (E.D. Tex. 1992). It does not matter "that the belief belongs to a party other than the plaintiff." *Little*, 924 F.2d at 96; *accord Bergen v. Continental Cas. Co.*, 368 F. Supp. 2d 567, 575 (N.D. Tex. 2005). Where, as here, Melanson does not adduce objective evidence refuting the rational reasons articulated by the employer, pretext cannot be established by mere subjective beliefs that discrimination motivated the

employer's actions. *See Moore*, 2009 WL 423926, at *2; *Aryain*, 534 F.3d at 487; *Roberson*, 373 F.3d at 654; *Armendariz v. Pinkerton Tobacco Co.*, 58 F.3d 144, 153 (5th Cir. 1995), *cert. denied*, 516 U.S. 1047 (1996).

III.  Conclusion

Under the totality of the circumstances, Melanson has failed to demonstrate that Covenant's articulated reasons for his termination are false, much less that they are a pretext for age-based discrimination. Furthermore, Melanson has not rebutted Covenant's ample evidence of a legitimate, nondiscriminatory reason for his termination. As a consequence, Melanson cannot prevail on his claim of discriminatory discharge, and summary judgment for Covenant is warranted. Accordingly, Covenant's Motion for Summary Judgment is GRANTED.

SIGNED at Beaumont, Texas, this 18th day of March, 2009.

MARCIA A. CRONE
UNITED STATES DISTRICT JUDGE